UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,   Court File No. 14-cr-367 (ADM/LIB) (1)

      Plaintiff,

v.   **REPORT AND RECOMMENDATION**

Alan Sam,

      Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant Alan Sam's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 19]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on January 9, 2015, regarding the parties' pretrial discovery motions[1] and Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 19]. The parties requested an opportunity to submit supplemental briefing which was completed and the motion to suppress was taken under advisement as of January 23, 2015.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], be **DENIED**.

**I.    BACKGROUND AND STATEMENT OF FACTS**

    **A.    Background**

Defendant Alan Sam ("Defendant") is charged with one count of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3), 1151, and 1153(a); and one count of

---

[1] The Court addressed the parties' discovery motions by separate Order.

assault resulting in serious injury, in violation of 18 U.S.C. §§ 113(a)(6), 1151, and 1153(a). (Indictment, [Docket No. 1]).

**B.     Facts[2]**

The record presently before the Court indicates that, shortly after 8 a.m. on September 19, 2014, Officer Evan Parisien of the Bois Forte Police Department responded to a report of a disturbance at an apartment building in the New Moon Housing complex, which is located within the borders of the Bois Forte Indian Reservation. Officer Parisien received additional information while on his way to the apartment building which indicated that a trail of smeared blood stains had been seen in the building's common hallway.

Upon arrival, Officer Parisien followed the trail of blood stains to the door to apartment #7. Officer Parisien had encountered Defendant on multiple previous occasions and knew that Defendant lived in that apartment. Officer Parisien knocked on the door to the apartment, identifying himself and asking for someone to open the door.  Defendant opened the door shortly thereafter, whereupon Officer Parisien saw that Defendant had dried blood on his face, clothes, and arms. Officer Parisien could not see whether Defendant was injured.

At the door, while still in the hallway, Officer Parisien asked Defendant about the source of the blood, whether Defendant was injured, and whether there were any weapons or other persons in the apartment. Defendant appeared to be intoxicated to Officer Parisien, who detected a strong odor of alcohol coming from Defendant and noted that Defendant spoke slowly and slurred his words as he answered. Officer Parisien could also see that Defendant had glossy, bloodshot eyes. However, Defendant appeared to be able to track the conversation and he

---

[2]Except where expressly noted otherwise, the facts are derived from the testimony of Bois Forte Police Department Officer Evan Parisien and Federal Bureau of Investigation Special Agent Timothy Ball at the January 9, motions hearing.

provided appropriate answers to Officer Parisien's basic questions. Defendant told Officer Parisien that he was not injured and that his nose had been bleeding.

Officer Parisien asked Defendant if he would allow him to enter the apartment. Defendant responded by motioning Officer Parisien inside. Upon entering, Officer Parisien could see that blood had also been smeared on the doors and walls inside of the apartment. He also spotted two individuals in the apartment's bedroom. While Defendant remained in the apartment's kitchen, Officer Parisien went to check on the other two individuals.

Officer Parisien determined that the individuals in the bedroom were intoxicated but not injured. Officer Parisien also determined that one of the individuals in the bedroom was a juvenile. While checking on them, Officer Parisien called in to dispatch to check whether there were any outstanding warrants for anyone then in the apartment. After being informed that there were no outstanding warrants for anyone in the apartment, Officer Parisien detained the intoxicated juvenile and brought him outside to secure in his squad car because underage consumption of alcohol was unlawful.

At about that time, dispatch provided updated information to Officer Parisien, indicating that there were in fact warrants for both Defendant and the other adult individual who remained in apartment #7. After securing the juvenile in his squad car, Officer Parisien returned to the apartment, where he discovered that while Defendant had remained in the apartment the other individual had fled. Officer Parisien then returned to his squad car to call for assistance.

As Officer Parisien returned outside to his squad car, he encountered Vincent Chosa, who also had dried blood on his person and had a visible laceration on his forehead as well as lacerations on his neck. Officer Parisien summoned an ambulance and waited outside with Chosa until it arrived. Officer Parisien then returned to apartment #7. There, Officer Parisien detained

Defendant and placed him in handcuffs. At approximately 8:25 a.m., Officer Parisien secured Defendant in his squad car. Shortly thereafter, Defendant was transferred to the squad car of a second officer to arrive on the scene. Officer Parisien checked on Defendant approximately every 15 minutes throughout the morning, and he saw that Defendant was sleeping.

Officer Parisien then contacted Federal Bureau of Investigation Special Agents ("SA") Timothy Ball and Craig Heidenreich and informed them that an assault had occurred in the New Moon Housing complex. SAs Ball and Heidenreich arrived at the scene at some point between 9:00 a.m. and 10:00 a.m. The SAs consulted with the officers already on scene, processed the hallway and Defendant's apartment, and asked to see video recordings that had been made by the apartment building's surveillance system. The SAs then began conducting interviews.

At approximately 1:40 p.m., Defendant was removed from the squad car and brought back inside the apartment building to be interviewed. Defendant's handcuffs were removed and, without being physically controlled by a law enforcement officer, he walked into a small conference room (about 10' x 10') where the interview was conducted. There, Defendant took a seat at a small table in the middle of the room.

Only Defendant, SA Ball, and SA Heidenreich were present for the interview, which the SAs recorded. Before asking Defendant any questions, the SAs identified themselves. As Defendant took a seat, the SAs asked Defendant about his condition, whether he understood what was going on, and whether he was ready to talk to them. (Government Ex. 1 at 1:30-1:48). Defendant indicated to the SAs that he was "just sobering up." (Id. at 1:38). Defendant also stated that he understood what was going on and was ready to talk to the SAs. (Id. at 1:40-1:48). The SAs then read Defendant a Miranda warning. (Id. at 2:00-2:20). After being read the Miranda warning, Defendant said that he would "cooperate fully with the investigation." (See Id.

4

at 3:05-3:11). Defendant also signed an FBI Advice of Rights form, acknowledging that he had read the Miranda warning, understood it, and had agreed to answer questions without a lawyer present. (See Government Ex. 2).

During the interview, Defendant told the SAs that he had consumed multiple shots of alcohol the night before and, as a result, had blacked out. (Government Ex. 1 at 12:00-14:15, 24:12-24:35). Defendant also repeatedly described having physically fought with Chosa, for reasons he stated he did not remember, and attacking Chosa with a knife. (Id. at 14:50-15:15, 17:00-17:25, 18:15-18:50, 27:45-27:55, 28:15-28:30, 29:35-29:50, 33:45-33:55).

During the interview, Defendant appeared to SA Ball to be tired but not intoxicated. Defendant also appeared to be coherent, to track the conversation, and to understand both the questions being asked and the situation. Defendant did not at any point during the conversation appear confused to SA Ball. Defendant did not slur his speech when answering questions. The interview lasted approximately forty-three (43) minutes.

No threats were made during the course of the interview. At no time during the interview did the SAs withhold anything from Defendant. When Defendant asked for water towards the end of the interview, the SAs provided it, and they also offered Defendant food. SA Ball later testified that he had been armed during the interview, but he had not at any time drawn or displayed his weapon. SA Ball further testified that he believed that Defendant could not have seen his weapon as it had been covered by his shirt.

After the interview, Defendant was arrested, handcuffed, and placed back in Officer Parisien's squad car. Officer Parisien transported Defendant to the Bois Forte Police Department, where he was booked and later transported to a holding facility. Defendant was later indicted

with one count of assault with a dangerous weapon and one count of assault resulting in serious injury. He then filed the present motion.

## II. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS [DOCKET NO. 19]

As initially submitted, Defendant's motion asked the Court to suppress: (1) the statements Defendant made to Officer Parisien; and, (2) the statements Defendant made while being interrogated by SAs Ball and Heidenreich.

In his supplemental brief, Defendant represented that he was no longer seeking to suppress the statements that he made to Officer Parisien. (Def.'s Memorandum in Support of Motion to Suppress, [Docket No. 27], 1).

Defendant acknowledges that he was read the Miranda warnings and signed a form indicating that he had chosen to answer the questions of SAs Ball and Heidenreich without having a lawyer present. (Id. at 2). Nonetheless, Defendant now asks the Court to suppress the statements he made during the interview, arguing that he had not voluntarily waived his rights to remain silent and to have counsel present during questioning. (Id. at 3).

### A.   Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

A defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B.      Analysis**

Defendant contends that the statements he made during the interview by SAs Ball and Heidenreich were not the product of a voluntary waiver of his Miranda rights, arguing that the combination of his lack of sleep, intoxication, and the circumstances surrounding the interview had rendered his waiver invalid. The government argues that the Court should find, under the totality of the circumstances, that Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

It is undisputed that Defendant was in custody during the interview and that the SAs' express questioning of Defendant constituted interrogation for the purposes of Miranda. It is also undisputed that SAs Ball and Heidenreich read Defendant a Miranda rights warning at the beginning of the interview and, further, that Defendant indicated both verbally, as well as, in writing that he understood his Miranda rights before any of the challenged questioning took place. Accordingly, the sole issue presently before the Court is whether Defendant's waiver of his Miranda rights was valid as being voluntarily, knowingly, and intelligently made.

The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver

by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

    1. Voluntariness

Courts assess whether a waiver of the Miranda rights was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C.Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F .3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

On the present record presently before the Court, SAs Ball and Heidenreich did not engage in any specific coercive tactics during the interview. The SAs were not violent with Defendant and at no time made threats or promises to him. See United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). The SAs did not withhold anything from Defendant, they provided him with water when he asked for it, and they also offered him food. See Williams v. Norris, 576 F.3d 850, 869 (8th Cir. 2009) (affirming finding that Miranda waiver had been voluntary where, among other factors supporting the determination, the defendant had been provided with food and water). The SAs conducted the interview in a conversational tone. See United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors supporting the determination, interview was conducted in a reasonable, conversational tone). The interview, which lasted only forty-three minutes, was also not coercive in its duration. See Id. (noting that interrogation lasting more than two hours was not coercive in duration). Further, there is nothing in the record to indicate that the small conference room in the apartment complex had created a coercive environment.

Defendant nevertheless argues that his ability to resist coercive pressures had been reduced as a result of alcohol intoxication and his lack of sleep. There is no direct evidence in the record presently before the Court regarding the amount of alcohol Defendant consumed during the evening of September 18, 2014, and possibly the early morning hours of September 19, 2014. However, Defendant's statements that he had consumed a significant amount of alcohol are supported by the observations of Officer Parisien upon first encountering Defendant shortly after

8 a.m. on September 19, 2014. Officer Parisien testified that Defendant appeared intoxicated at that time, with glossy, blood-shot eyes, speaking slowly and slurring his words.

However, mere evidence that a suspect was intoxicated several hours prior to being interrogated is insufficient to compel a conclusion that the suspect's Miranda waiver was involuntary. See United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (holding waiver voluntary even when defendant had consumed alcohol along with pain killers, muscle relaxants, and a mixture of cocaine and marijuana several hours before the interrogation, where officers testified that defendant appeared awake and coherent); Contreras, 372 F.3d at 978 (holding waiver voluntary even when defendant had taken methamphetamine the night before and smoked marijuana the same day, where officers testified that defendant appeared to be sober and in control of his faculties at the time he consented). As the Eighth Circuit has previously explained, "[s]leeplessness, alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary.'" Gaddy, 532 F.3d at 788 (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)); see also Turner, 157 F.3d at 555-56 (refusing to adopt a per se rule for intoxication). "[T]he test is whether these mental impairments caused the defendant's will to be overborne." Casal, 915 F.2d at 1229.

In between his early morning encounter with Officer Parisien and the afternoon interview, Defendant was secured in a squad car for several hours during which he was able to sleep. As such, any sleeplessness Defendant may have experienced the night before had been ameliorated to some degree. Similarly, the intoxicating effect of the alcohol Defendant had consumed the previous night would also have dissipated to some degree with the passage of those hours. The evidence in the record presently before the Court regarding Defendant's condition at 1:40 p.m. consists of the testimony of SA Ball and the recording of the interview.

SA Ball testified that Defendant appeared tired but not intoxicated during the interview and, in fact, he appeared coherent and able to understand both the questions being asked of him and the situation he was in. The Court's independent review of the audio recording of the interview supports SA Ball's testimony. At the beginning of the audio recording, Defendant himself told SAs Ball and Heidenreich that he had begun to sober up and represented that he understood the situation enough to answer questions. During the interview, Defendant spoke in a clear and occasionally animated voice and did not display the slow, slurred speech Defendant was described to have uttered during his earlier encounter with Officer Parisien. Even more persuasive is the character of Defendant's manner during the interview. Shortly after being read the Miranda warnings, Defendant expressed a desire to cooperate fully with the investigation into the incident. Defendant's responses throughout the interview reflect that position. Defendant answered the questions posed to him openly, at times providing the SAs with far more information than their questions asked for.

In sum, the record as a whole presently before the Court indicates that Defendant's waiver of his Miranda rights was entirely voluntary.

2. Knowing and Intelligent

The Court must next consider whether Defendant's waiver of his Miranda rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his Miranda rights and presence of mind during the interview consists of SA Ball's testimony, the audio recording of the interview, and the written FBI Advice of Rights form. SA Ball testified that Defendant appeared to understand the Miranda warnings when they were read to him, and to understand the situation he was in. The Court's independent review of the audio recording of the interview provides similar indications that Defendant

11

appeared to fully track the conversation, understood the questions being posed to him, and provided contextually appropriate answers. In light of those affirmative indications that Defendant in fact understood the Miranda warnings, the Court concludes that Defendant's waiver of his Miranda rights was also knowing and intelligent.

Because, upon considering the totality of the circumstances Defendant's waiver of his Miranda rights was knowingly, intelligently, and voluntarily made, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19].

### III. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], be **DENIED**.

Dated: February 4, 2015                                s/Leo I. Brisbois
                                                       Leo I. Brisbois
                                                       U.S. MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 18, 2015** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections **by March 4, 2015**. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.